UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA        :
          :
         vs.         :
          :      S1 07 Cr. 522 (BSJ)
RAJ MEHTA          :
          :
        Defendant.    :
          :
          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## SENTENCING MEMORANDUM OF RAJ MEHTA

COOLEY GODWARD KRONISH LLP

Alan Levine
John C. Dwyer
Daniel H. Davis
1114 Avenue of the Americas
New York, NY 10036-7798
Phone:    (212) 479-6000
Fax:      (212) 479-6275

*Attorneys for Defendant*

We respectfully submit this Sentencing Memorandum and the accompanying exhibits on behalf of Raj Mehta, who will be sentenced on Friday, February 29, 2008.

## PRELIMINARY STATEMENT

Raj Mehta comes before the Court with full acknowledgement of his wrongdoing. He knows that his conduct was illegal, and he accordingly accepted a plea agreement from the Government that acknowledges his guilt. However, the plea agreement also allows Mr. Mehta to seek a non-Guidelines sentence based on the factors enumerated in 18 U.S.C. § 3553(a). In consideration of a number of factors under 18 U.S.C. § 3553(a), including the severity of the offense, its duration and its loss, the characteristics of the defendant and his unique and critical role as an irreplaceable caregiver to his 97-year old grandmother and 76-year old mother, and his conduct since the offense in 2003, we submit that a non-Guidelines sentence of home confinement followed by a period of supervised release is fair, serving the interests of justice and of society.

Mr. Mehta's 76-year old mother and 97-year old grandmother are totally dependent on him for their well-being, and in his grandmother's case, for her very survival. Mr. Mehta assumed responsibility for them long before the conduct giving rise to this offense took place. The passage of time since 2003 has seen a significant deterioration in their conditions, which he responded to before he ever came to realize that he would be charged with a federal crime. Caring for his grandmother and mother is not a responsibility that Mr. Mehta created for purposes of fashioning an excuse; it is a moral responsibility that he took on because of a life of devotion to his family completely independent of this case.

The offense as more completely described herein and set forth in the Pre-Sentence Report was discovered at the earliest stage – fortunately before any loss was suffered and before Mr.

Mehta had received any ill-gotten gains – although it is not clear that Mr. Mehta would or could have profited from the scheme. And, once Mr. Mehta was confronted by the internal audit department of his employer, he acknowledged what he had done. Since that date, he has continued to admit his mistake, he has accepted the consequences of his conduct, and he has moved his young life in a more charitable and productive direction.

We therefore respectfully request that the Court impose a non-Guidelines sentence directing that Mr. Mehta be allowed to continue to provide the care upon which his grandmother and mother so desperately rely. We believe a sentence requiring him to serve any custodial period under home confinement (along with the requisite tracking devices and an appropriate period of supervised release) would serve the interests of justice by providing appropriate punitive sanctions without imposing unintended collateral punishment on his innocent family members.

## I.    FACTUAL BACKGROUND

As the Pre-Sentence Report provides an accurate description of Mr. Mehta's background and his crime, we provide here only a brief summary of the basic facts of this case.

Mr. Mehta was first employed by KBC Financial Products ("KBC") in 1999. Mr. Mehta eventually moved to KBC's proprietary trading desk, where he invested KBC's own funds in what was known as the Synergy portfolio. In 2002, Mr. Mehta's management of the Synergy portfolio was extremely successful. Mr. Mehta's success continued into the first quarter of 2003. However, in the second quarter of 2003, as the bond market took a downward turn, the Synergy portfolio began to suffer significant losses. At that time, Mr. Mehta, concerned with how his superiors would react to the losses in the portfolio, began falsely reporting the value of certain positions in the portfolio in order to hide some of those losses.

Specifically, as part of the daily closing process, Mr. Mehta would, consistent with company policy, seek estimates or quotes from, among others, certain outside financial institutions as to the value of the various positions within the portfolio. (These estimates and quotes were generally provided by these sources via electronic mail.) He would then use those quotes to "mark" the portfolio to reflect its value at the close of each trading day. Starting in the second quarter of 2003, Mr. Mehta altered the quotes in the internal reports he created in order to inflate the reported value of the portfolio. At the time, it was Mr. Mehta's hope that the actual value of the Synergy portfolio would rebound in the coming weeks and months to recoup the losses he had suffered.

In the third quarter of 2003, Mr. Mehta's fraudulent reporting was discovered. When KBC contacted Mr. Mehta regarding the valuation of the Synergy portfolio, Mr. Mehta cooperated with the internal investigation and admitted what he had done. As the PSR notes, the false valuations did not cause any loss to any victim. PSR, ¶¶ 11, 75. He was terminated shortly thereafter. Since that time, he has never disputed what occurred and has repeatedly expressed remorse.

In 2004, Mr. Mehta voluntarily surrendered his trading license to the NASD and left the securities profession entirely. In that same year, he was in communication with the United States Attorney's Office for the Southern District of New York and was prepared to present a proffer to the Government. Mr. Mehta did not hear from the Government again for nearly three years, in early 2007. The Indictment in this case was filed on June 11, 2007. On November 2, 2007, Mr. Mehta, in accordance with a plea agreement reached with the United States Attorney's Office, pled guilty to four counts of wire fraud relating to the activities described above. The plea agreement stipulates as reasonable a Guidelines Offense Level of 13, a sentencing range of 12-18

months, and permits Mr. Mehta to seek a lower, non-Guidelines sentence based on the factors

enumerated in 18 U.S.C. § 3553(a).

## II.     LEGAL STANDARD

After the Supreme Court's decisions in *United States v. Booker*, 125 S. Ct. 738 (2005),

and *United States v. Gall,* No. 06-7949, slip. op. at 18 (S. Ct. Dec. 10, 2007), it is now clear that

the Sentencing Guidelines are advisory when determining a criminal defendant's sentence; only

one factor to be considered among many in imposing a sentence. *Gall* describes the Guidelines

as "a matter of administration and to secure nationwide consistency," and instructs that district

court judges are to use the Guidelines only as a "starting point" and a "benchmark." *Id.* at 11.

The district judge should "consider all of the § 3553(a) factors to determine whether they support

the sentence requested by a party." *Id.*

*Gall* further instructs that the Guidelines range is not to be presumed reasonable, but

rather "an individualized assessment based on the facts presented must be made." *Id.* at 12. "If

[the district court judge] decides that an outside-Guidelines sentence is warranted, he must

consider the extent of the deviation and ensure that the justification is sufficiently compelling to

support the degree of the variance." *Id.*   Any non-Guidelines sentence imposed by the district

court need not be justified by "extraordinary circumstances," nor is there any rigid relationship

between the extent of the departure and the extent of the justifications required for a specific

sentence. *Id.* at 8.   Rather, a district court's decision that § 3553(a) factors justify a non-

Guidelines sentence is due deference – "[t]he fact that [an] appellate court might reasonably have

concluded that a different sentence was appropriate is insufficient to justify reversal of the

district court." *Id.* at 13.

Ultimately, the Supreme Court held in *Gall* that the district court's sentencing of Gall to probation for participation in a conspiracy to distribute over 10,000 pills of ecstasy (from which Gall voluntarily withdrew) was not unreasonable. While the Court noted that under the Guidelines Gall would have been sentenced to a longer period, "the Guidelines are not mandatory, and thus the range of choice dictated by the facts of the case is significantly broadened." *Id.* at 20 (internal quotation marks omitted). Further, "the Guidelines are only one of the factors to consider when imposing sentence, and § 3553(a)(3) directs the judge to consider sentences other than imprisonment." *Id.* And, in discussing Gall's specific sentence, the Court observed that while "custodial sentences are qualitatively more severe than probationary sentences of equivalent terms . . . [o]ffenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty." *Id.* at 9. "Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes . . . [and may be] subject to individual 'special conditions' imposed by the court." *Id.* at 9-10.

Accordingly, "the sentencing judge [should] consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Id.* at 13-14 (internal citation omitted). In other words, a district judge may include in determining the proper sentence "the judge's own sense of what is a fair and just sentence under all the circumstances." *United States v. Jones*, 2006 WL 2167171 at *3 (2d Cir. Aug. 2, 2006).

## II.    18 U.S.C. SECTION 3553(a) FACTORS

After *Booker* and *Gall* and pursuant to 18 U.S.C. § 3553, a sentence should be "sufficient, but not greater than necessary" to achieve the sentencing goals as enumerated in § 3553(a).  To do so, courts must consider the following factors:

> (1) the nature and characteristics of the offense and the history and characteristics of the defendant;
> (2) the purposes of sentencing, including reflecting the seriousness of the offense, promoting respect for the law, punishment, deterrence, and protecting the public;
> (3) the kinds of sentences available;
> (4) the advisory guidelines;
> (5) any pertinent policy statements;
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1)-(7).

We believe that a fair balancing of these factors – including Mr. Mehta's role as an irreplaceable caregiver for his family, the comparable severity of his crime, his acceptance of responsibility and his considerable charitable efforts – all weigh in favor of a sentence that is substantially below the range stipulated in the plea agreement and that provides for any custodial portion of Mr. Mehta's sentence to be served in home confinement with the requisite monitoring technology, followed by an appropriate period of supervised release.

### A.    Mr. Mehta is an Irreplaceable Caregiver

The most significant factor that we believe should be taken into account in determining an appropriate sentence for Mr. Mehta is his status as an irreplaceable caregiver for his grandmother and mother.[1]  (This status relates to a number of the §3553(a) factors, including the

---

[1]    Both Mr. Mehta's mother and grandmother are naturalized United States citizens.  Mr. Mehta's grandmother is also his legal dependent.

history and characteristics of the defendant, the purpose of sentencing and the kind of sentences available.) Although most criminal sentences impose some sort of significant hardship on the families of the convicted individual, the law acknowledges that there are some unique circumstances that are so compelling that the underlying purposes of the federal sentencing statutes would not be served if those hardships were ignored. This is precisely such a case.

### 1.    Mr. Mehta's Grandmother, Chandraprabha D. Master

As set forth in the letters appended to this memorandum[2] and as set forth in the PSR, Mr. Mehta is the sole caregiver for his grandmother, Chandraprabha D. Master, a frail, immobile, almost 97-year old woman who is completely dependent on Mr. Mehta for all her daily activities. Among other ailments, she suffers from Alzheimer's and dementia. As a result, she is easily confused and very weak. According to her primary care physician, Mrs. Master suffers from a number of other conditions as well, including uncontrolled urination, shingles, hypothyroidism, and intense muscle and bone pain. Ex. 3 at 1. She has suffered two fractures in the past two years. *Id.* Her care is further complicated by the fact that she only speaks Gujarati, an Indian dialect, and her ability to communicate even in that language has deteriorated. *Id.*; Ex. 1 at 2.

Mrs. Master is completely dependent on Mr. Mehta for her daily care as well as her emotional and spiritual well being. The letters submitted with this memorandum all show that Mr. Mehta's relationship with his grandmother and the care he provides to her is his single most defining aspect. *See, e.g.,* Ex. 2 at 2. In short, for the last five years, Mr. Mehta has provided the

---

[2]      Family members, friends and professional colleagues of Mr. Mehta have submitted a number letters to the Court on his behalf – they are listed in Appendix A and are attached to this memorandum. Included with these letters is a submission from Mr. Mehta himself. While Mr. Mehta plans to address the Court at his sentencing, he wanted the opportunity to communicate with the Court at greater length.

Mr. Mehta's letter, and letters from Mr. Mehta's mother, Rashmi Mehta, her doctor, Dr. Somireddy K. Reddy, Mr. Mehta's grandmother's doctor, Dr. Sunil Patel, and Mr. Mehta's wife, Dr. Kavita Patel, are all cited in the following sections and are referenced as Exhibits 1, 2, 3, 4 and 5 respectively.

nearly 24-hour a day care that his grandmother requires. He takes his grandmother to the bathroom, helping her in and out of her wheelchair and onto the toilet. He bathes her, dresses her, prepares her traditional vegetarian dinners and massages her joints nightly to relieve her bone and muscle pain. He picks up and administers her medications; he communicates with her doctors and the home attendant who occasionally visits. In the evenings, Mr. Mehta reads to his grandmother, and they say prayers together. As her condition has worsened, Mr. Mehta has been forced to spend more and more time at home and now typically works several days each week from home. Ex. 1 at 2-3; Ex. 2 at 1-2. Dr. Patel, Mrs. Master's physician, believes that Mr. Mehta's love, companionship and familiarity sustain his grandmother: "Mrs. Master cannot function without 24-hour supervision . . . Based on my experience, I believe being cared for by her grandson has helped Mrs. Master maintain her level of health." Ex. 3 at 2.

2.    **Mr. Mehta's Mother, Rashmi Indrajit Mehta**

Mr. Mehta's only other blood relative in the tri-state area is his 76-year old mother, Rashmi Indrajit Mehta. Unfortunately, rather than being able to help care for Mrs. Master, Mr. Mehta's mother requires a great deal of attention from Mr. Mehta as well. As set forth in the attached letter from her physician, Mrs. Mehta is in poor health, suffering from glaucoma, diabetes, and a spinal condition called spondylolisthesis which causes her to experience severe back and leg pain. Ex. 4 at 1. The practical effects of these conditions are that Mrs. Mehta, even with the aid of a cane, cannot walk long distances, negotiate stairs, stand for any long period of time, drive at night or drive more than a few miles from home without experiencing significant leg pain. *Id.* As the PSR notes, she typically leaves the second floor of their home just once a day and is unable to stand for more than five minutes at a time. PSR, ¶ 35. She desperately requires and is scheduled to undergo early this year her second complicated spinal neurosurgery,

8

after which she will be confined to a bed for at least several weeks, followed by months of rehabilitation. Ex. 2 at 1. She will be forced to forego that procedure if her son is unavailable to help her. *Id.* Given her physical condition, she is unable to provide in any significant way the care that Mr. Mehta's grandmother requires.

Moreover, Mr. Mehta provides a considerable amount of assistance to his mother. He runs all the day-to-day aspects of his mother's business, a small motel on Staten Island (for which he is not compensated). *Id.* at 1-2. As with his grandmother, Mr. Mehta shops for groceries and prepares food for his mother and picks up her various medications. *Id.* Mr. Mehta also drives his mother to local temples several times a week, thus allowing her to practice her Hindu faith.

### 3.    There are no Alternative Caregivers

Unfortunately, there are no other options available to Mr. Mehta should he be incarcerated and removed from his family's home on Staten Island. Mr. Mehta is an extremely responsible person, and, faced with the possibility of incarceration, he has already investigated possible alternative care for his grandmother. He has not come up with any answers. The combination of his grandmother's fragile physical and mental condition, her inability to communicate in any language but a local Indian dialect, his mother's poor health and the lack of any local family members create a situation that is even unique among the extenuating family circumstances that can face a federal defendant.

As indicated above, there are no other blood relatives or family friends who could be called upon to provide the necessary care, and Mrs. Mehta is not physically able to care for her mother. (Mr. Mehta's father passed away in 1992.) Mr. Mehta does employ home attendants several days a week during the day to assist with his grandmother. However, Mr. Mehta has not

9

been able to find a legal and competent home attendant who speaks Gujarati, his grandmother's only language. The attendants that periodically work for Mr. Mehta rely on his frequent phone calls to achieve basic communication with his grandmother. Ex. 1 at 1-2. Without a Gujarati-speaking attendant and/or Mr. Mehta's assistance, his grandmother will not be able to communicate even her most basic needs.

While Mr. Mehta's immediate family is very close, his mother and his wife are not viable caregivers. Mr. Mehta's mother already requires considerable aid herself – for some time, she has not been physically capable of caring for another. Kavita Patel, Mr. Mehta's wife of six months, is just beginning a new career as a radiologist and will be engaged full-time at Columbia University. She has no relationship with Mr. Mehta's grandmother; she does not speak Gujarati; and she simply cannot provide the physical, intellectual and emotional comfort which has undoubtedly sustained Mr. Mehta's grandmother thus far. In essence, Mr. Mehta's new wife would be no different than any other non-Gujarati speaking, paid caregiver that he might find to care for his grandmother. She would not be able to provide the human, emotional connection to this increasingly isolated woman that, as indicated above, her doctor believes is critical to her well being.

The Second Circuit has long recognized the flexibility inherent in the federal sentencing process to take into account circumstances such as these. It is clearly appropriate to impose a sentence below the Guideline range when a term of imprisonment may "wreak extraordinary destruction on dependents who rely solely on the defendant." *United States v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992) (upholding departure where defendant was sole supporter of four young children). *See also United States v. Galante*, 111 F.3d 1029, 1035 (2d Cir. 1997) (upholding departure where defendant provided support for two children and wife spoke limited English);

*United States v. Alba*, 933 F. 2d 1117, 1122 (2d Cir. 1991) (upholding departure where defendant supported his wife, two young children and disabled father, who relied upon defendant to get out of his wheelchair). Such factors can be taken into account by imposing a non-Guidelines sentence. *United States v. Selioutsky*, 409 F.3d 114 (2d Cir. 2005). *See also United States v. Yit Tin Kon*, No. 04 Cr. 271-03, 2006 U.S. Dist. LEXIS 81407 (S.D.N.Y. Nov. 2, 2006) (post-*Booker*, upholding 3553(a) departure where defendant supported two-year old child and had no other available adult help).[3]

The above are all common extraordinary family circumstances cases in that they involve young children, some of whom were born at or about the time of the relevant offense. Mr. Mehta's extenuating circumstances differ in an important respect: he has no children and he is not therefore facing a difficult situation of his own making. Rather, Mr. Mehta has assumed a moral responsibility for his grandmother and mother based on an intense devotion that he feels towards his family.

The specific facts of *Johnson*, *Alba* and *Yit Tin Kon* are additionally instructive. In each case, before family circumstances were considered, the various defendants possessed Guidelines offense levels that were greater than the 13 stipulated in Mr. Mehta's plea agreement and stated in the PSR. (Defendants Johnson, Gonzalez (from *U.S. v. Alba*) and Kon faced offense levels of 23, 22 and 19, respectively. *Johnson*, 964 F.2d at 126; *Alba*, 933 F.2d at 1119; *Yit Tin Kon*, 2006 U.S. Dist. LEXIS at *10.) Yet, each defendant received a sentence that included no prison term.

---

[3]    We note that each of the above cases were decided pre-*Gall* (and pre-*Booker*, except for *Yit Tin Kon*), under an appellate framework that required "extraordinary" circumstances for a downward departure or a non-Guidelines sentence. *Gall* held that a non-Guidelines sentence no longer requires "extraordinary" circumstances. *Gall*, slip. op. at 8. Rather, a district court judge "must make an individualized assessment based on the facts presented," and "[i]f he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* at 11-12.

11

Johnson, who was convicted of conspiracy, bribery and theft of public money from the Bronx

Veterans Administration Hospital, was sentenced to six months home detention followed by

three years supervised release. *Johnson*, 964 F.2d at 126-131. Gonzalez, who had pled guilty to

a charge of conspiracy to distribute and to possess with intent to distribute two kilograms of

cocaine, was sentenced by the district court to six months in a halfway house and two years of

supervised release.[4] *Alba*, 933 F.2d at 1118. And Kon, guilty of possession with intent to

distribute ecstasy, received a sentence of time served (one day) and three years supervised

release. *Yit Tin Kon*, 2006 U.S. Dist. LEXIS at *3-15. The *Yit Tin Kon* court also noted that

defendant Kon's lack of any prior criminal activity was a significant factor in awarding no prison

time.

Further, availability of alternative care is an established factor in determining an

appropriate sentence. Specifically, in *United States v. Huerta*, 371, F.3d 88, 95 (2d Cir. 2004),

the Second Circuit articulated that "this factor – the absence or presence of adults who can step

in during the defendant's incarceration to assist with caring and providing for the defendant's

dependents – is a central part of the extraordinary family circumstances inquiry." And where, as

in Mr. Mehta's case, "no such reasonable alternative is available, and the defendant is the sole

care-taker of his or her dependents, a sentencing court can exercise its discretion under a finding

of extraordinary family circumstances." *Yit Tin Kon*, 2006 U.S. Dist. LEXIS at *13-14.

Given the nature of his criminal conduct and his familial obligations, the arguments in

favor of fashioning a sentence for Mr. Mehta that will allow him to continue to provide care for

his grandmother and mother are even more compelling than in those cases. Mr. Mehta's

---

[4]    Though the Court of Appeals remanded defendant Gonzalez for resentencing, it specifically noted that it did not disapprove of the downward departure for Gonzalez's extraordinary family circumstances. *Alba*, 933 F.2d at 1118.

stipulated offense level of 13 is substantially below any of the three defendants involved in the cases described above. The dependency of his grandmother and his mother on his care is overwhelming. We submit that incarceration would extend punishment to his mother and grandmother – a very unfortunate consequence.

### 4.    The PSR Incorrectly Concludes that Mr. Mehta is Not an Irreplaceable Caregiver

In making its sentencing recommendation to the Court, the Probation Department states that "it is unpersuaded that the defendant alone has the ability to care for his mother and grandmother." PSR at 23. We believe that this conclusion is incorrect and is based on several miscommunications and misconceptions that arose in the pre-sentence investigation process.

Probation apparently bases its final recommendation that Mr. Mehta be sentenced to 12 months and one day on its conclusion that he is not an irreplaceable caregiver for three reasons: (1) Mr. Mehta's ability to pay for sufficient care; (2) the possibility that Mr. Mehta may move out of his Staten Island home to live with his wife; and (3) the availability of Mr. Mehta's new wife to "supervise" care for his grandmother and mother. *Id.* On each issue, the Probation Department has misinterpreted statements made during the pre-sentence investigation process.

First, we do not dispute that Mr. Mehta could afford to provide care for his grandmother and mother. Unfortunately, he has been unable to find caregivers that can effectively communicate with his grandmother and, thus, provide the appropriate care. This is a unique situation: naturalized United States citizens from India in which the most senior family member speaks a dialect that is uncommon in this country. Recognizing the possibility of incarceration, Mr. Mehta has sought to hire someone that can communicate with his grandmother, but has been unsuccessful. Mrs. Master is a fragile woman, both physically and mentally, and in her final years suffering from a deteriorating Alzheimer's and dementia condition. It is likely that the loss

13

of her grandson for a prolonged period will have profound consequences. The fact that he might be able to be replaced by a non-Gujarati speaking attendant that can bathe and feed her will do little to alleviate her isolation or provide the emotional and spiritual support upon which she depends.

Second, Mr. Mehta has no plans to leave his home on Staten Island and leave his family behind. The Probation Department indicated that Mr. Mehta and his wife intend to find a new home no more than 45 minutes away from his mother and grandmother's home. PSR, ¶ 37. This is an incomplete statement. Mr. Mehta will *not* leave his family behind. If anything, the pre-sentence investigation should have revealed that Mr. Mehta's selfless devotion to his family is his most defining attribute. While Mr. Mehta and his wife may look for a new home, any change in residence would be made *with* Mr. Mehta's mother and grandmother. Mr. Mehta and his wife have previously discussed this issue at length, as they both describe in their attached letters. Ex. 1 at 3; Ex. 5 at 1.

Finally, Mr. Mehta's wife, Kavita Patel, did not indicate to the Probation Department that she can provide the care that Mr. Mehta's grandmother requires – in fact, we think it likely that Probation misinterpreted Ms. Patel's remarks in their brief conversation – and therefore Probation was incorrect to cite Ms. Patel's "supervision" as a factor permitting Mr. Mehta to be replaced as a caregiver. Ms. Patel found herself in an awkward position when being interviewed by Probation. While she attempted to explain her inability to care for Mr. Mehta's mother and grandmother, she naturally stopped short of saying that she would be *uninvolved* in their care, should Mr. Mehta be incarcerated. However, the Probation Department confuses her common decency with a commitment and ability to substitute herself for Mr. Mehta in providing the care that Mr. Mehta's grandmother requires. As previously stated, Ms. Patel has not formed a

connection with Mr. Mehta's grandmother in the short time that they have been married. Ex. 5 at 1. She does not speak Gujarati, she is not a professional caregiver and she has not at any point provided any of the care that Mr. Mehta's grandmother requires. *Id.* In that way, she would be no different from any other inexperienced, non-Gujarati speaking caregiver that Mr. Mehta could find. Ms. Patel's care – or "supervision" – would be deficient for all the same reasons.

It is critically important that the Court note that these misstatements in the PSR are the foundation for the PSR's mistaken conclusion that Mr. Mehta is not an irreplaceable caregiver.

**B.      Nature and Characteristics of the Offense; History and Characteristics of the Defendant**

Mr. Mehta committed a fraud against KBC. That fraud consisted of the manipulation of quotes in incoming emails and the transmission of those emails to his superiors. Mr. Mehta became nervous when his investment portfolio sustained losses, he feared for his reputation as a star-trader and his standing in the company, and he suffered a serious lapse in judgment – an error that he acknowledges, regrets and apologizes for. Fortunately, as the PSR notes, Mr. Mehta's actions did not cause anyone any harm.

Mr. Mehta's fraud, however, is an aberration in a life marked by strong character, charity, respect and unfailing devotion to family, as described in detail above and in the accompanying letters. Mr. Mehta has been utterly honest, forthcoming, responsible and contrite since the moment that he was first confronted by his superiors at KBC almost five years ago. Since that date, Mr. Mehta has cooperated with every formal and informal investigation of his conduct, answered every question he has been asked, and acknowledged and apologized for his actions. For example, he cooperated with KBC's internal investigation of his actions, admitting his wrongdoing in statements to KBC's lawyers. Shortly thereafter, Mr. Mehta voluntarily surrendered his NASD license and left the practice of securities trading altogether. When Mr.

Mehta originally came under investigation by the U.S. Attorney's Office in 2004, he was prepared to present a proffer to the Government. While that investigation became dormant and only resumed in mid-2007 when Mr. Mehta was indicted, his position did not change. He did not challenge any of the conduct described in the indictment, and he did not withhold any information from the Government. Perhaps most importantly, he has pled guilty to the crimes charged, thus eliminating the need for the government to further prosecute the case.

Even prior to the indictment in this case, and at a time when he had every reason to believe that he very well might not be indicted,[5] Mr. Mehta had begun the process of taking responsibility for his actions. (In *Gall*, the Supreme Court noted that such self-inspired rehabilitation was of "great weight" in considering the proper sentence to impose. *Gall*, slip. op. at 18 .) Mr. Mehta has recast his life – he has left the world of securities trading completely behind and now works with a family friend in the hotel business.

In addition to transitioning to a much less lucrative career path, Mr. Mehta has performed many acts of selflessness in an effort to help others. As set forth in the attached letter from Ila Sukhadia, he has spearheaded and organized programs to help immigrants learn English (allowing some classes to take place in his home). He worked tirelessly to get supplies to areas ravaged by the 2004 tsunami in southeast Asia. In 2005, after one of Mr. Mehta's childhood friends committed suicide, Mr. Mehta organized a youth conference through his Hindu temple, the Vishwa Hindu Parishad, to discuss mental health and the cultural taboos that face young Hindu-Americans. Hundreds of Hindi youth and parents participated. He works with "In2Books," a charity devoted to teaching underprivileged children to read. Mr. Mehta also

---

[5]     We also note that at the time Mr. Mehta initiated his considerable charitable efforts in 2004-05, he (and his counsel) believed that the Government's investigation into his conduct had concluded – his actions were therefore not motivated by any desire to influence his eventual punishment. We had been in contact with the U.S. Attorney's Office and offered to bring Mr. Mehta in for an interview – our offer was declined. Nothing further was heard on this matter for over three years until we were notified that an indictment would be filed.

contributes in more traditional ways as well, donating significant sums to charity over the past five years to, among others, the Robin Hood Foundation, the Harlem Children's Zone, the Vishwa Hindu Parishad (his temple), the Legal Aid Society, and Kids in Danger.  Mr. Mehta has more recently reached out to major Wall Street institutions on his own initiative and has offered to lead ethics sessions for young finance employees.  He seeks to use his own example to educate others about the pressures and moral dangers of the securities world.  On, January 30th, he led his first such seminar with a group of young professionals.

Considering Mr. Mehta's devotion to his family and his charitable devotion to the causes described above, it is clear that he is an extraordinarily generous man for his age – a person who, but for one aberrant action, has utterly committed himself to making the world around him a better place, in both small and big ways.  We submit to the Court that, if Mr. Mehta receives a sentence of home confinement and supervised release, not only will he be able to care for his family – a selfless goal in and of itself – but that he will continue to direct his tireless efforts to those in his community that need his help.

### C.    Purposes of Sentencing: Respect for the Law, Punishment, Deterrence, Protecting the Public

The various factors outlined in § 3553(a)(2) also support the imposition of a sentence in Mr. Mehta's case that includes as a custodial portion a period of home confinement.

Mr. Mehta has no criminal history.  But for his actions in 2003, he has never run afoul of the law.  Mr. Mehta presents no risk of recidivism.  Put simply, Mr. Mehta is not an individual who needs to be taught respect for the law.  Indeed, in the letters attached hereto, it is clear that Mr. Mehta has repeatedly expressed his remorse for his conduct to his family, friends and co-workers.  Furthermore, respect for the law is unlikely to be enhanced by a sentence, in circumstances such as these, that would have such dire consequences for a 97-year old woman

17

and a 76-year old woman. Indeed, the Supreme Court has noted favorably a lower court's observation that "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed merely as a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall*, slip. op. at 15.

Further, Mr. Mehta does not need to be imprisoned to be appropriately punished. He has already lost his job and surrendered the license that he had worked so hard to obtain. In losing his position at KBC, Mr. Mehta also forfeited approximately $400,000 in deferred compensation from 2002 that he otherwise would have been paid by KBC. In addition, a sentence providing for home confinement and/or supervised release would constitute significant additional punishment. As noted earlier, the Supreme Court in *Gall* emphasized that offenders on probation are subject to substantial restrictions on their liberty that should not be regarded as merely nominal, non-punitive sanctions. *Gall*, slip. op. at 9-10. The liberty interests affected by a sentence requiring home confinement are that much more substantial and meaningful.

Deterrence is not a significant factor in Mr. Mehta's sentence. Mr. Mehta poses no risk of recidivism. His lack of any criminal history and self-rehabilitation support the prediction that he will not commit another crime; thus, incarceration will not serve to deter Mr. Mehta from any future criminal behavior. Indeed, the fact that justice can reflect mercy will not diminish the general deterrent effect of the federal criminal laws.

Finally, Mr. Mehta poses no danger to the public whatsoever. He has no prior criminal history, and he will not engage in any future criminal behavior. Accordingly, Mr. Mehta need not be incarcerated to protect the public from harm.

### D.    The Kinds of Sentences Available

The Supreme Court made clear that district court judges must consider alternatives *other than* imprisonment when sentencing defendants. *Gall*, slip. op. at 20-21. Indeed, "[u]tilization of alternatives to incarceration in appropriate cases" motivated the institution of the Guidelines and is intended to be used in a manner complimentary to its policies." *US v. K*, 160 F. Supp. 2d 421, 432 (E.D.N.Y. 2001). Thus, factor (a)(3) provides "flexibility" to sentencing judges by "provid[ing] alternatives to incarceration where necessary . . . ." *Id.* at 432. Home confinement and probation are ready alternatives to imprisonment under *Booker* and *Gall*. Given the circumstances of this case, we believe that these other sentencing options should be considered for Mr. Mehta. A sentence of home confinement, followed by a period of supervised release, will allow Mr. Mehta to continue to care for his ailing grandmother, to support his mother, and to continue to work for the charitable efforts which he has initiated and organized through his temple and in his community. Such a sentence would be effective in punishing Mr. Mehta's crime, but not cruel in its retribution – serving the underlying purposes of the criminal law while reflecting the mercy of which the system is capable.

### E.    The Advisory Guidelines

Pursuant to the terms of the plea agreement, the parties have agreed to an offense level of 13. The PSR also calculates an offense level of 13.

### F.    Pertinent Policy Statements

We are not aware of any policy statements that bear on Mr. Mehta's case.

### G.    Unwarranted Sentencing Disparities Among Similar Defendants

There would be no disparity among Mr. Mehta and similarly situated defendants should his sentence not include a period of incarceration. In fact, as discussed in Section II, A, *infra*,

Mr. Mehta's criminal activity is less severe than defendants who have received non-incarceration sentences due to extraordinary family circumstances. We believe that a true disparity would arise if Mr. Mehta was to be imprisoned and separated from the family that he cares for when more dangerous, violent and culpable defendants are permitted to care for their families.

**H.    The Need For Restitution**

There is no need for restitution in this case, as stated in Paragraphs 11 and 75 of the PSR.

**III.    CONCLUSION**

Mr. Mehta is an irreplaceable caregiver for his grandmother and mother. He faces a unique family situation in which language barriers and poor health make his continued presence critical to his grandmother's well being and survival. Mr. Mehta, at a comparatively young age, has also devoted himself to philanthropy, investing his time, effort and resources in a number of important causes. It is no understatement to say that Mr. Mehta has devoted himself completely to family and to charity. His crime – for which he has accepted responsibility and which fortunately caused no loss – is an aberrant act in a young life fundamentally devoted to making the world around him a better place. We respectfully submit that for these reasons, viewed individually or collectively, Mr. Mehta should be sentenced to a term of home confinement, followed by a term of supervised release.

Dated:        New York, New York
              February 22, 2008

                        Respectfully submitted,

                        COOLEY GODWARD KRONISH LLP

                        _____
                              Alan Levine (AL-1073)

                        John C. Dwyer
                        Daniel H. Davis
                        1114 Avenue of the Americas
                        New York, NY  10036-7798
                        Phone:  (212) 479-6000
                        Fax:      (212) 479-6275

                        *Attorneys for Defendant*

## **CERTIFICATE OF SERVICE**

I, Daniel Davis, hereby certify that I caused a true and correct copy of the

foregoing Sentencing Memorandum by Federal Express this 22nd day of February, 2008 upon:

> Randall W. Jackson
> Assistant United States Attorney
> U.S. Attorney's Office, S.D.N.Y.
> One St. Andrew's Plaza
> New York, NY 10007

_____
Daniel H. Davis (DD-0090)